D

ORIGINAL

SEALED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST OF TX
FILED

2016 JUN 15 AM 11:59

DEPUTY CLERK ___

| UNITED STATES OF AMERICA | NO. |
| --- | --- |
| v. | **FILED UNDER SEAL** |
| SHAWN CHAMBERLAIN | 3-16CR 260-D |

INFORMATION

The United States Attorney charges:

At all times material to this Information:

General Allegations

The Medicare Program (Generally)

1. The Medicare Program (Medicare) was a federal health care program providing benefits to individuals who were over the age of 65 or disabled. Medicare was administered by the United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services (CMS). Individuals receiving benefits under Medicare were referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program" as defined by 18, U.S.C. § 24(b).

3. "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health care agency (HHA) to beneficiaries requiring home health services because of an illness or disability causing them to be homebound. Payments for home health care medical services under Medicare Part A

were typically made directly to an HHA or a provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiaries.

4. Physicians, clinics, and other health care providers, including HHAs that provided services to Medicare beneficiaries, were able to apply for and obtain a Medicare "provider number." A health care provider that was issued a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare identification number, the services that were performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider that ordered the services.

5. CMS did not directly pay Medicare Part A claims submitted by Medicare certified HHAs. CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States. In the State of Texas, CMS contracted with Medicare Administrative Contractors (MACs), including Trailblazer Health Enterprises (Trailblazer) and Novitas Solutions (Novitas), to administer Part A HHA claims. As administrators, MACs received, adjudicated, and paid claims submitted by HHA providers under the Part A program for home health care services.

6. The Medicare program paid for home health services only if the beneficiary qualified for home health care benefits. A beneficiary qualified for home health care benefits only if:

a. the beneficiary was confined to the home, also referred to as homebound;

b. the beneficiary was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care (or POC, described in Paragraph 9, below); and

c. the determining physician signed a certification statement specifying that:

  i. the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy;

  ii. the beneficiary was confined to the home;

  iii. a POC for furnishing services was established and periodically reviewed; and

  iv. the services were furnished while the beneficiary was under the care of the physician who established the POC.

7. Medicare Part A regulations required HHAs providing services to Medicare beneficiaries to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their beneficiaries, as well as records documenting actual treatment of the beneficiaries to whom services were provided and for whom claims for payment were submitted by the HHA.

8. These medical records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

9. Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare was a POC, which included the physician order for home health care, diagnoses, types of services, frequency of visits, prognosis, rehabilitation potential, functional limitations, activities permitted, medications, treatments, nutritional requirements, safety measures, discharge plans, goals, and physician signature. A POC signed and dated by the physician, or a signed and dated written prescription, or a verbal order recorded in the POC were required in advance of rendering services. Also required was a signed certification statement by an attending physician certifying that the beneficiary was confined to his or her home and was in need of the planned home health services, and an assessment of the beneficiary's condition and eligibility for home health services, called an Outcome and Assessment Information Set (OASIS). The OASIS also set the basis by which a HHA was paid. The more severe a beneficiary's medical conditions, as reflected by the OASIS, the more money Medicare would pay the HHA for providing care.

10. Medicare Part A regulations required provider HHAs to maintain medical records of each visit made by a nurse, therapist, or home health care aide to a beneficiary. The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the beneficiary, any teaching and the understanding of the beneficiary, and any changes in

the beneficiary's physical or emotional condition. The home health care nurse, therapist, or aide was required to document the hands-on personal care provided to the beneficiary if the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury. These written medical records were generally created and maintained in the form of "visit notes" and "home health aide notes/observations."

## TIMELY HOME HEALTH SERVICES, INC.

11. Timely Home Health Services, Inc. (Timely) was a Texas corporation doing business at 9535 Forest Lane, Suite 119, Dallas, Texas. Timely became a Medicare Provider in or about March 2004. Timely submitted claims to Medicare for home health services.

12. **Chamberlain** and his coconspirators caused Timely to submit false and fraudulent claims to Medicare for home health care services on behalf of Medicare beneficiaries who were not homebound or otherwise eligible for home health care service.

## The Defendant

13. **Shawn Chamberlain**, a resident of Collin County, Texas was a physician assistant (PA) and a part-owner of Boomer House Calls (Boomer). **Chamberlain** hired physician Kelly Robinett 1) to apply for a Medicare number to allow **Chamberlain** to bill Medicare for physician home visits, and 2) to sign false physician certifications for home health care. **Chamberlain** provided these false physician certifications for home health care to Timely from approximately August 2013 through at least September 2015.

## Count One
## Conspiracy to Commit Health Care Fraud
## (Violation of 18 U.S.C. § 1349 (18 U.S.C. § 1347))

14. Paragraphs 1 through 13 of this Information are realleged and incorporated by reference as though fully set forth herein.

15. From in or about January 2007 through in or about September 2015, in the Dallas Division of the Northern District of Texas and elsewhere, **Chamberlain** did knowingly and willfully combine, conspire, confederate and agree with Patience Okoroji, Usani Ewah, Kingsley Nwanguma, Joy Ogwuegbu, Kelly Robinett and Angel Claudio and others known and unknown, to violate 18 U.S.C. § 1347, that is, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in 18 U.S.C. § 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services

### Purpose of the Conspiracy

16. It was a purpose of the conspiracy for **Chamberlain** and his coconspirators to unlawfully enrich themselves by, among other things, causing the submission and concealment of false and fraudulent claims to Medicare and causing the diversion of the proceeds of the fraud for the personal use and benefit of **Chamberlain** and his coconspirators.

## Manner and Means of the Conspiracy

17. The manner and means by which **Chamberlain** and his coconspirators sought to accomplish the purpose of the conspiracy included, among other things:

## The Scheme to Defraud

18. It was part of the scheme to defraud for **Chamberlain** and his coconspirators to knowingly submit and cause to be submitted to Medicare, false and fraudulent claims for home health care services on behalf of Medicare beneficiaries who were not homebound or otherwise eligible for home health care services.

19. **Chamberlain** and his coconspirators knew that many of the beneficiaries enrolled as patients of Timely were not homebound, not in need of home health care, not under the care of the physician, and not otherwise eligible to receive Medicare-covered home health care.

20. **Chamberlain** would accept from his coconspirators fraudulent "physician telephone order" forms that purported to prescribe home health care. **Chamberlain** would give these forms to Robinett knowing they were fraudulent and Robinett would sign these forms knowing they were fraudulent.

21. **Chamberlain** would accept from his coconspirators, known and unknown, false and fraudulent POCs and would secure certifications from his physician coconspirators, known and unknown, for home health care when the beneficiaries did not qualify for home health care and were not under the care of these physician coconspirators.

22. **Chamberlain** would conduct physician home visits for Timely patients regardless of whether there was a medical necessity for physician home visits and without being under the supervision of a physician.

23. **Chamberlain** and his coconspirators caused Medicare to be billed approximately $1.6 million for false certifications, unnecessary home health services, and unnecessary physician home visits.

All in violation of 18 U.S.C. § 1349 (18 U.S.C. § 1347).

JOHN R. PARKER
UNITED STATES ATTORNEY

*/s/ Adrienne E. Frazior*
ADRIENNE E. FRAZIOR
Assistant United States Attorney
Texas State Bar No. 24059546
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214.659.8600
Facsimile: 214.659.8805
Email: adrienne.frazior@usdoj.gov